## CLAUDE NEON LIGHTS, Inc., v. AMERICAN NEON LIGHT CORPORATION et al.

### No. 57.

Circuit Court of Appeals, Second Circuit.
March 3, 1930.

See, also, 36 F.(2d) 998.

Charles J. Holland, of New York City, for appellants.

Bohleber & Ledbetter, of New York City (Edwin J. Prindle, William Bohleber, and Frederick Griswold, Jr., all of New York City, of counsel), for appellee.

Before MANTON, SWAN, and AUGUS-TUS N. HAND, Circuit Judges.

MANTON, Circuit Judge.

Appellants on this appeal seek to review a preliminary injunction entered in this suit for patent infringement, on patent No. 1,-125,476, issued to appellee's assignee January 19, 1915. We held the patent valid and infringed in Claude Neon Lights, Inc., v. Machlett & Son, 27 F.(2d) 702. The validity of the patent is not questioned on this appeal, but infringement is contested.

The appellant American Neon Light Corporation manufactures the alleged infringing luminescent tubes. Appellants Shulhof, McGuirk, Lefcourt, Haas, Unger, Nickelsburg, Jacobs and White were directors of the American Neon Light Corporation, and are sued as infringers. White, Rose, Greene, and Doctor were conducting a business under the name of Neon Tube Sign Corporation, selling the tubes, and it was not a de facto or de jure corporation. These appellants are assuming to act as its officers and agents. Jacobs and Brooks were doing business as Kane, Brooks & Co., selling the stock, and thus provided funds for the corporation, and are charged with aiding and abetting the infringement or as contributing infringers.

The patent relates to the illumination by luminous tubes containing rare gases of the atmosphere, particularly neon gas. This gas becomes luminescent by the passage therethrough of high-voltage electric currents. The current is introduced into the gas through conducting electrodes at the two ends of the tube. These electrodes are internal and in direct contact with the gas. The outer ends of the electrodes are connected to terminal wires which pass outward through the glass walls in which they are hermetically sealed.

The ends of terminal wires outside of the tubes are connected to the two sides of the high-voltage circuit. The gas in the tube acts as a conductor of electricity and becomes "ionized," with the result that the gas is caused to glow, and, in the case of neon, it gives off a distinctive orange red color. The neon gas alone in the neon tube is a conductor of electricity through the tube, and it is the luminescence of the gas which causes the illumination.

In his experiments, the inventor found that the production of a successful neon light tube was more than the problem of constructing the tube, placing the gas in it, sealing it up, and passing current through it. He found that, if he did this, he would not have a neon tube, but a tube of an entirely different color showing the spectra of active gases, such as carbon dioxide, hydrogen, and nitrogen, which would completely mask and discolor the spectrum of the neon. The neon gas is extremely sensitive to impurities. The most minute trace of carbon dioxide would completely mask the distinctive orange red color of neon and would turn the tube blue in color, which is a characteristic color of carbon dioxide. Moreover, it was found that impurities increased the heating and reduced the electrical efficiency of the tube. Such impurities were found to be due to three causes: (a) They might exist in the neon itself prior to its introduction into the tube; (b) they are constituents of the air existing in the tube prior to its exhaustion (air contains active gases such as nitrogen, oxygen, carbon dioxide, and water vapors, and these constitute the impurities which are troublesome in neon tubes); and (c) they are present on and under the surface of glass walls and electrodes to which neon gas is exposed.

The patent therefore calls for a neon tube and that the impure air in the tube be exhausted to a high state of vacuum prior to the introduction of neon. This was accomplished by the use of an efficient pump. The impurities which exist on and under the surface of solid substances, such as the electrodes and glass walls of luminescent tubes, are called occluded gases, and must be driven out from these parts to such an extent that, when the tubes are ultimately in commercial use, no more occluded gases will issue forth from these parts by the heating which takes place with the normal current. The problem of producing a neon tube of long life was solved by the inventor, as we pointed out in

27 F.(2d) 702. In the presence of rare gases such as neon, the sputtering of the electrodes is very pronounced, and in tubes of this kind there is a dark area immediately surrounding the electrodes, and, if the electrodes are small, there is a considerable drop in potential occurring at the dark space, which causes the electrodes to become highly heated. This drop in potential is called electrode drop.

The inventor found that, under these conditions, the electrode metal evaporized or sputtered at a high rate which means that the particles of material of which the electrode is composed are torn off and deposited on the glass walls of the tube surrounding the chamber in which the electrode is located. Accompanying this vaporization or sputtering, as the particles of the metal are torn from the electrode, they carry with them a certain quantity of neon gas which is pocketed by the particles of electrode material against the glass walls. This pocketing of the gas soon causes so much of the gas to be used up and the pressure reduced that the neon tube no longer remains conductive when the lamp goes out. This difficulty was overcome by increasing or extending the surface area of the electrodes. It resulted in a reduction of the electrode drop of potential. The inventor expressed this extension of the electrode area in terms of a current area relationship in excess of 1.5 square decimeters per ampere. As a result, the life of the tube was increased to the extent that the tube burned continuously without refilling for a length of time comparable with the life of an incandescent lamp. The luminescent neon tube contained purified neon gas, internal electrodes deprived of their occluded gases and a surface area of the electrodes extended to exceed 1.5 square decimeters per ampere of current to decrease the vaporization of the electrodes by reducing the electrode drop and thereby to prevent depletion of the neon gas.

Claim 1 of the patent in suit is charged to be infringed.

"A luminescent tube containing previously purified neon and provided with internal electrodes for illuminating said gas, said electrodes being deprived of occluded gases and having an area exceeding 1.5 square decimeters per ampere, to decrease the vaporization of the electrodes and prevent the consequent formation upon the walls of the tube, in proximity to said electrodes, of deposits containing said gas, whereby the luminosity of the tube is maintained constant for a very considerable period of time without a fresh introduction of gas."

■ The appellants contend their tubes do not contain previously purified neon. They contend that the "previously purified neon," as called for by the claims, means purifying the neon in the tube as by aging. But the patent is not limited to any particular method of purifying the neon or to any particular method of manufacturing the tube. It does not mean purification on the spot; it means neon gas which is in the tube, and, when operating in the regular way, has been purified previous to its regular commercial use, and this the appellants' does. 27 F.(2d) 702. The test of whether a tube contains previously purified neon is shown by the characteristic color of neon and there is ample testimony that the appellants' tubes clearly show such color. A product claim is not to be limited by the process of its manufacture. Procter & Gamble v. Berlin Mills (C. C. A.) 256 F. 23, 29; General Electric Co. v. Laco-Philips (C. C. A.) 233 F. 96.

A running test was made of the appellants' tubes, and throughout the tubes maintained the characteristic neon color, and no impurities were given off by the electrodes to impair the neon spectrum. The tubes in evidence were in commercial use for about two weeks, and there was no evidence that any impurities had been given off by the electrodes to discolor the neon gas, and, as an expert testified, this demonstrated that the electrodes had been deprived of their occluded gases. To be deprived of their occluded gases, as the patent specifies, means a sufficient deprivation of the gases so that no further gases will come out of the electrodes in normal use. The appellants' current of 400 milliamperes of current in the manufacture of their tubes, the experts testified, will sufficiently remove the occluded gases from the tube so that the tube will remain pure under normal current and conditions of use.

The Le Brun process, according to Dr. Fink (which the appellants say they are using), instead of degasifying electrodes, consists in saturating them with gases to such an extent that they will take up no more gas. This prevents them from absorbing any of the neon gas in the tube, and, although the electrodes and inner walls are saturated with nitrogen and other gases which the inventor states are impossible to have within the tube without damage, in accordance with the Le Brun process, this is quite possible. In other words, before the tube is made and before the electrodes are mounted therein, the pores of the electrode are filled with nitrogen and hydrogen, which act as a seal against absorption of neon gas. Whether or not this is possible is unimportant, for the appellants do not practice it. The appellants' process upon test and examination shows clearly that the electrodes have been deprived of occluded gases.

The test made for the appellants by the Bureau of Standards merely shows there are more residual gases in appellants' electrodes than in appellee's. This is accounted for by the fact that in manufacturing its tubes, appellee's practice is to subject the electrode to a temperature of from 800° to 900° centigrade, whereas appellants use only 300°. As it is substantially admitted that the little gases in the electrode are removed—the last determinal traces—it follows that the electrodes are deprived of their occluded gases.

The appellants' electrodes exceed 1.5 square decimeters per ampere. The value of 1.5 square decimeters per ampere set forth in the claim of the patent in suit is stated as a minimum and not a maximum value.

Therefore it is established that the appellants' tubes have (a) previously purified neon; (b) internal electrodes for limiting said gas, said electrodes being deprived of their occluded gases, and (c) having an area exceeding 1.5 square decimeters per ampere to decrease the vaporization of the electrodes and prevent the formation upon the walls of the tube of deposits containing said gases and infringe the patent. The patent having heretofore been sustained by this court, and it clearly appearing that the appellants infringe, it was proper to grant the preliminary injunction.

■ The directors of the American Neon Light Corporation were properly enjoined from continuing the infringement. This corporation was organized after the introduction of the invention into this country and after it had attained considerable commercial success. The corporation was organized to enter the neon sign business. There was litigation pending in the various courts of the United States for infringement of this patent. The directors were more than merely organizing a corporation; they specifically depended upon the manufacture and sale of neon luminescent tubes which reasonable men would have known were an infringement of the patent in suit. Their corporation, of doubtful financial stability, manufactured and sold this patented article. Directors of a corporation who so contemplate and carry on such infringing acts in the name of the cor-

poration, are personally responsible to the owners of the patent. All persons who participate in the infringement are liable, although some are simply acting as officers of the corporation. National Car-Brake Shoe Co. v. Terre Haute Car & Mfg. Co. (C. C.) 19 F. 514. A director and officer of a corporation who, by a vote or otherwise, specifically commands subordinate agents of a corporation to engage in the manufacture and sale of an infringing article, is liable individually in an action for damages brought for such infringement. It is immaterial whether the director or officer knew or was ignorant that the article manufactured and sold did infringe the patent. D'Arcy Spring Co. v. Marshall Co. (C. C. A.) 259 F. 236; Crown Cork & Seal Co. v. Stopper Co. (C. C.) 172 F. 225; National Cash-Register Co. v. Leland (C. C. A.) 94 F. 502. But officers or directors of a corporation will not be held personally liable for damages resulting from infringement where they do not exceed their duties as officers and directors. They become liable when they do exceed their authority and use the corporation to carry out their own willful and deliberate infringement. Dangler v. Imperial Machine Co. (C. C. A.) 11 F.(2d) 945.

■ The injunction was likewise properly granted against White, Rose, Greene, and Doctor, who did business under the name and style of Neon Tube & Sign Corporation. When the infringing acts complained of in the bill of complaint were committed, the Neon Tube & Sign Corporation had not been incorporated; it was incorporated on September 21, 1922, two weeks after this bill was filed. Thus these appellants were conducting their business of a de facto corporation. They were liable for the torts committed by that corporation, for persons who assume to act as officers or agents of a purported corporation which, in fact, has no corporate existence de jure or de facto, will be liable personally on contract for breach of contract or tort committed. White on Corporations (9th Ed.) pp. 24, 25.

■ It was error, however, to enjoin the appellants Brooks and Jacobs. These appellants were copartners doing business as Kane, Brooks & Co., and were selling stock. They sold or underwrote stock of the American Neon Light Corporation and sent forth many stock sales circulars, but this may not be regarded as aiding and abetting in the wrongful infringement of the patent in suit. What they wrote in such advertisements may

have libeled the appellee's patents, but infringement contemplates more than that. Hutter v. De Q Bottle Stopper (C. C. A.) 128 F. 283. The injunction as to them will be dissolved.

As thus modified, the decree is affirmed.