**Application of William J. KRODEL et al. and Norman Hackerman.**

**Patent Appeal No. 6140.**

United States Court of Customs and Patent Appeals.

June 15, 1955.

Arthur F. Larrabee, Los Angeles, for appellants.

E. L. Reynolds, Washington, D. C. (Clarence W. Moore, Washington, D. C., of counsel), for the Commissioner of Patents.

Before O'CONNELL, Acting Chief Judge, and JOHNSON, WORLEY, COLE, and JACKSON (retired), Judges.

JOHNSON, Judge.

This is an appeal from the decision of the Board of Appeals of the United States Patent Office affirming the holding of the Primary Examiner rejecting as unpatentable over the prior art and as functional claims 18 and 19, the only remaining claims in appellants' application for a patent for a "Process for De-inking Printed Waste Paper."

The appealed claims read as follows:

"18. The process of de-inking printed material which comprises forming an aqueous slurry of printed and shredded waste newsprint stock material, [then adding to the slurry a water soluble salt yielding an ion having a valency of at least 4,] *to thereby induce a zeta potential of the same charged sign as the ink particles and which differs from that of similarly charged particles of the material by a factor of at least 4, to thereby effect a substantial separation of the ink particles from the material particles;* then adding to the resultant mass a detergent of a suitable type to emulsify the separated ink particles and retain them in suspension and separated from the material particles; then subjecting such mass to a temperature of 150-190° F. for a period of ½-2 hours and agitating the mass during said period; and then removing the separated ink particles from the slurry and mass with the water (Brackets and italics added.)

"19. The process of de-inking printed material which comprises forming an aqueous slurry of printed and shredded waste newsprint stock material, then adding to the slurry a water soluble salt yielding an ion having a valency of at least 4, to thereby induce a zeta potential of the same charged sign as the ink particles and which differs from that of similarly charged particles of the material by a factor of at least 4, to thereby effect a substantial

separation of the ink particles from the material particles, then adding to the resultant mass a detergent of a suitable type to emulsify the separated ink particles and retain them in suspension and separated from the material particles; then subjecting such mass to a temperature of 150-190° F. for a period of ½-2 hours and agitating the mass during said period; then applying to electrodes in contact with such mass an imposed electric potential difference approximating 1.8 to 2.4 volts per inch of linear distance between said electrodes, and without permitting electrolysis, and to substantially complete the separation of the ink particles from the material fibers; and then removing the separated ink particles from the slurry and mass with the water."

As can be seen from the above claims, the process recites a series of steps for de-inking printed paper. All of the recited steps, except as hereafter noted, seem to be self-explanatory, and adequately describe appellants' process. Therefore, it is believed that only the italicized portion of claim 18 and the bracketed subject matter relating to this italicized portion need be further explained. It appears to be the theory of operation of appellants' process that by adding a water soluble salt having a valence of at least 4 that a charge of the same sign is placed on both the ink particles and on the paper. Since particles having charges of like sign will repel each other, the placing of charges of like sign on the particles to be separated will aid in their separation. The specification states, insofar as pertinent here, that the water soluble salt may be tetrasodium pyrophosphate ($Na_4P_2O_7$). It appears from the specification, relative to the above italicized portion of claim 18, that the zeta potential, in effect, is proportional to the rate of movement of a charged particle in an electrolyte, and can be determined according to a given formula after making certain physical measurements. It is stated in the speci-

fication that "it is desirable that the salt and its concentration which is used give the greatest possible difference between the zeta potentials, as this will effect a more rapid and more thorough separation between the ink particles and the cellulose fibers." It is further stated in the specification, "To obtain satisfactory results from a practical standpoint, zeta potential of the one [the ink particles] should be at least four times greater than the zeta potential of the other [the paper], and there appears to be no maximum difference." This is brought out in different terminology in the italicized portion of claim 18. It is further shown in the disclosure that an optimum concentration of the salt will give the greatest difference in zeta potentials, but if the concentration is greater or less than the optimum value this desirable difference between zeta potentials is not obtained.

The references relied on are:

Bonser 1,008,779 Nov. 14, 1911; Darling 1,925,372 Sept. 5, 1933; Snyder et al 1,933,228 Oct. 31, 1933; Rassow (Br.) 506,472 May 30, 1938; Ellis, "Printing Inks" pp. 480–483, 1940; West, "Deinking of Paper", April 1943, pp. 5 to 9.

Relative to claim 18, the Board of Appeals felt that West, Darling, and Rassow references were the most pertinent, the patents to Ellis and Snyder et al. being merely cumulative. We will therefore only set forth the teachings of the former, the latter being unnecessary to our decision. The Bonser reference was relied on with respect to claim 19; therefore, the substance of this reference will also be set forth hereafter.

The West publication relates to deinking of paper. Insofar as pertinent here, it teaches that shredded printed paper may be cooked at a temperature of 140° F. to the boiling point for 2½ to 48 hours. It is further stated that a deinking formula is used which, among other things, consists of: (1) "An alkali to saponify the varnish or vehicle of the ink—sodium hydroxide, sodium carbonate, calcium hydroxide, sodium silicate or metasilicate, trisodium phosphate, soaps, and other chemicals, either separately or in various combinations;" (2) "a detergent * * * sodium silicate, or bentonite in the presence of an alkali and trisodium phosphate or tetrasodium pyrophosphate;" (3) "a base exchange chemical—such as tetrasodium pyrophosphate or hexasodium metaphosphate to prevent formation of calcium soaps where the water used for washing is too hard."

The Darling patent relates to a process for de-inking printed paper. Claim 1 of the patent succinctly sets forth the patented process and is therefore quoted in its entirety as follows:

"1. The process of separating the cellulosic fibers of filled and printed paper from the printing ink and fillers therein contained which comprises beating the paper in a solution containing an alkaline reacting compound selected from the group consisting of sodium hydroxide, sodium metasilicate and trisodium phosphate in such proportions as to render said solution alkaline to the extent of having a hydrogen ion concentration of from pH 9.0 to pH 12.6 until the paper has been substantially disintegrated, and thereupon adding to the suspension thus formed a small amount of an emulsifying agent, continuing the beating for a short period of time, and thereupon filtering the suspension through a sieve fine enough to retain the cellulosic fibers but coarse enough to pass the fillers and ink particles."

It is also stated in the patent that the temperatures employed in the process may be between room temperature and 180° F.

The Rassow patent also relates to a process for removing printing ink from printed paper. The patent, insofar as pertinent, teaches the reducing of printed paper to fiber in aqueous solutions of

washing agents such as alkali or ammonium pyrophosphate.

The Bonser patent, which was used in combination with the above-cited references for the rejection of claim 19, relates to a process of removing ink from paper. The steps, insofar as pertinent here, consist of macerating the inked paper; treating it with a series of chemicals, and boiling it during one of the treatments; and then placing electrodes into the mixture, and passing electric current through it which causes a black deposit to form on one of the electrodes.

The Primary Examiner rejected claims 18 and 19 as unduly broad and functional. In this respect, he said that the above italicized portion of claim 18 "is not regarded as a process step but rather a statement of the result expected to be obtained by the step of addition of the stated salt. * * * The claims further call for the use of a 'detergent of a suitable type.' This expression is considered indefinite since the claim should point out what is suitable." The examiner also rejected claim 18 as being unpatentable over "any one of West, Darling, Ellis, Snyder et al. or Rassow," since they teach the subject matter, as set forth in the descriptions of these references given above. In this respect the examiner stated "It is apparent from these references that salts having multivalent ions are of known value in deinking and nothing patentable is seen in their use even though applicants may have discovered the mechanism of this action." The examiner rejected claim 19 on the references as applied to claim 18 in view of Bonser who teaches the applying of charged electrodes to the mass.

The Board of Appeals sustained the examiner's rejection that the above-italicized "thereby" clause of claim 18 rendered the claims unduly broad and functional. The board however disagreed with the examiner that the phrase "a detergent of a suitable type" rendered the claims indefinite. In this respect the board stated, "this recitation must be read in the light of the further reci-

tation to the effect that the detergent emulsifies the separated ink particles and retains them in suspension and separated from the material particles." The board also sustained the examiner's rejection on the above-cited prior art. In this respect, the board stated:

"* * * The references show that the salts which are used by the appellants for causing the ink to separate from the cellulose fibers have been used before for precisely the same purpose, and it appears to us that the same amounts of these salts would be used in following the teachings of the references as the appellants use, that is an amount which is sufficient to cause the ink to become separated from the cellulose fibers. Possibly the appellants' explanation of the action of the salt provides the art with a better approach for determining the proper amount of the salt. However, this does not render the process patentable because we find no evidence in this case that by following the present teaching the amount of salt which is added to the paper slurry differs so radically from that which is added in following the teachings of the references that new and unobvious results are obtained thereby."

The board also sustained the rejection of claim 19 for the reasons given by the examiner.

This case presents two main questions for our determination. The first is whether the italicized portion of claim 18 renders the claim functional. The second is whether the claims are met by the prior art. We are of the opinion that both these questions should be answered in the negative for reasons which will appear hereafter.

■■ It is well settled that functional statements in a claim cannot be relied on to endow the claim with patentable subject matter. In re Laurent, 186 F.2d 741, 38 C.C.P.A., Patents, 811; In re Kniel, 169 F.2d 820, 36 C.C.P.A.,

Patents, 701. A functional claim has been defined as not being for a substantive thing, but for the *result* which that thing accomplishes. II Walker on Patents, Deller's Ed., 769. A claim which is functional is improper because the claiming of the *function* or *result* is tantamount to extending the monopoly beyond the scope of the invention. See Holland Furniture Co. v. Perkins Glue Co., 277 U.S. 245, 48 S.Ct. 474, 72 L.Ed. 868. Furthermore, conveniently functional language at the exact point of novelty of a claim is objectionable, General Electric Co. v. Wabash Appliance Corp., 304 U.S. 364, 58 S.Ct. 899, 82 L. Ed. 1402, since the inventor is claiming what is old in the non-functional portion of the claim and merely claiming a desired result when he uses functional language at the exact point of novelty, this in essence being an attempt to extend the monopoly beyond the scope of the invention. In short, in our opinion, a true functional claim expresses what is desired rather than what is actually done or what is necessary for the operation of the invention.

Whether a specific claim is functional is at times very difficult to determine. More specifically, a claim may be grammatically constructed in such a manner that a statement therein appears to set forth a mere result, yet closer inspection will reveal that what appears to be a functional statement is not functional at all, but on the contrary, is a positive limitation which sets forth a particular characteristic which is necessary for carrying out the ultimate purpose of the invention. Therefore, each particular claim which appears to be functional must be viewed on its own particular set of facts to determine whether it is in fact functional.

In the present case we have a situation where one step of a process (the addition of the salt) must be performed in such a manner that a plurality of necessary characteristics (the valence of 4 and the required zeta potentials) must be obtained as a result of this one step

for the successful operation of the process. Since only one step giving two results is involved, this one step cannot be recited as a plurality of independent steps. It would therefore seem that it should be permissible for this one step to be expressed in the terms of result of the performance of the step as long as the statements of result contain *positive limitations* which are *required* for the performance of the process rather than a recitation of the result which is *desired* from the operation of the process.

We feel that the claims before us are not functional. We come to this conclusion because, in our opinion, the claims do not merely set forth a desired result, but, on the contrary, recite the necessary relationships and requirements for carrying out applicants' process. More specifically, the bracketed portion of claim 18, *supra*, recites the step of "adding to the slurry a water soluble salt yielding an ion having a valency of at least 4." There can be no doubt that this step specifically recites the adding of an element which has a specific characteristic. The portion of the italicized clause of claim 18, *supra*, which reads *"to thereby induce a zeta potential of the same charged sign as the ink particles and which differs from that of similarly charged particles of the material by a factor of at least 4,"* at first glance, appears to be functional in the sense that it might be construed that the *sole* purpose of the phrase is to recite a result which is desired to be obtained from the addition of a water soluble salt yielding an ion having a valence of at least 4. However, it is our opinion that this phrase sets forth much more, and is therefore not a mere statement of desired result. When the italicized portion of the claim, noted above, is read in its proper context in the claim, it must be considered to be a limitation which is required, as a result of the step of adding the salt, to successfully carry out the process. This phrase is as much a limitation of the claim as the recitation of the salt yielding an ion hav-

ing a valency of at least 4 since it recites an essential characteristic of the solution which must be obtained as a result of adding the salt. In other words, the above-quoted phrase does not merely set forth a desired result *per se*, but couples with the desired result a physical characteristic which is deemed necessary by appellants for the successful performance of their process.

The foregoing can best be illustrated by using òther terminology which appears in the same claim. The italicized portion of claim 18 which reads *"to thereby effect a substantial separation of the ink particles from the material particles,"* is clearly a functional statement which sets forth the ultimate result which is desired from applicants' process, and as such cannot be relied on for patentability. On the other hand, the "thereby" clause relating to the zeta potentials, as stated above, is in our opinion not functional. Thus we have in the same claim, in proximity to each other, two "thereby" clauses, one of which is functional because it merely sets forth an ultimate desired result whereas the other is not functional since it couples with a desired result a necessary physical characteristic which must be had in order to perform appellants' process.

■ There is no doubt a possibility that the non-functional "thereby" clause could be reworded so that it does not appear functional in form. However, it is our opinion that the form is hardly as important as the substance of the terminology, and the latter should be controlling. While it is desirable to have claims which clearly do not appear to be functional in order to prevent any misunderstanding of what is being claimed, yet under certain circumstances, as in the present case, the subject matter does not readily lend itself to a simple, nonfunctional appearing mode of expression. The reason for this, we believe, is that in the present case it is necessary to obtain two essential character-

istics which flow from the performance of a solitary step. An applicable criterion, we believe, is that if the claim, at the point of novelty, calls only for a desired result or defines the invention not in terms of what it is, but rather by what it does, then it should be rejected as functional. In re Fullam, 161 F.2d 247, 34 C.C.P.A., Patents, 1018, and cases cited therein. In the present case, we believe that the phrase relating to the zeta potentials is defined in terms of what it is, notwithstanding its seemingly functional language because of its dependency on the step of adding the salt. We therefore do not feel that it is objectionably functional.

■ Having thus come to the conclusion that the claim is not functional, we must now consider the question of patentability of the claims over the prior art. The pertinent portions of the prior art have been set forth above; this subject matter need not be repeated here. It is significant to note, however, that while the references teach shredding, heating, the use of tetrasodium pyrophosphate, and the use of electrodes, that none of them teach the concept of inducing zeta potentials. It is to be further noted that the obtaining of the zeta potentials set forth by appellants is not necessarily inherent in the processes taught by the prior art. We have often held that in determining patentability the conception of a new and useful improvement must be considered along with the actual means of achieving the improvement. In re Bisley, 197 F.2d 355, 39 C.C.P.A., Patents, 982; In re De Lancey, 159 F.2d 737, 34 C.C.P.A., Patents 849. Thus the mere fact that others have used the same chemical is not necessarily conclusive of lack of invention. As stated above, we are of the opinion that the phrase relating to zeta potentials is a positive limitation of the claim. This being the case, it can be seen from the specification that an optimum concentration is necessary to give optimum zeta potentials. If the concentration

is either too small or too large, the optimum zeta potentials will not be obtained. Thus it would seem that the mere addition of a proper salt in greater quantities would not give increased de-inking. It appears that the secret discovered by appellants is to obtain an optimum concentration of the chemical which in turn gives the desired zeta potentials. This, we feel, is a sufficiently unobvious result of applicants' process to warrant patent protection. We are especially of this opinion since the prior art does not appear to have recognized the problem solved by appellants and therefore cannot be said to have taught its solution. The discovery of a problem calling for an improvement is often a very essential element in an invention correcting such a problem. In re Bisley, supra; In re Hamilton, 64 F. 2d 141, 20 C.C.P.A., Patents, 987. We are therefore of the opinion that since appellants have set forth in their claims a series of steps which were not taught by the prior art and which do give an unobvious result that the claims should have been allowed.

Since we have found that claim 18 is allowable, we deem it unnecessary to consider claim 19 in detail. Since claim 19 contains all the limitations of claim 18, and recites the additional step of using electrodes to aid in the de-inking, we also consider it to be allowable.

We have carefully considered all of the other contentions made by appellants. However, since our decision renders these contentions moot, we feel that it is unnecessary to discuss them.

We are therefore of the opinion that for the foregoing reasons, the decision appealed from should be reversed.

Reversed.

JACKSON, J., Retired, dissents.

JACKSON, J., Retired, participated herein for GARRETT, C. J.