## BOOTH FISHERIES CORPORATION v. GENERAL FOODS CORPORATION et al.

No. 1267.

District Court, D. Delaware.

Dec. 8, 1942.

As Corrected Jan. 12, 1943.

---

[1] See, also, Brillhart v. Excess Insurance Co., 316 U.S. 491, at page 494, 62 S.Ct. 1173, 86 L.Ed. 1620.

Hastings, Stockly & Layton, of Wilmington, Del., and Benjamin V. Becker, Henry M. Huxley, Charles F. Murray, Frank Greenberg, and Robert E. Levin, all of Chicago, Ill., for plaintiff.

Hugh M. Morris, of Wilmington, Del., and William B. Kerkam and Ralph H. Hudson, both of Washington, D. C., for defendants.

BIGGS, Circuit Judge.

The complaint states two causes of action. The plaintiff seeks an accounting and an injunction for the alleged infringement by the defendants [1] of certain claims of the Cooke Patent No. 1,614,455. The complaint also prays for a declaratory judgment that the plaintiff is free of any liability for alleged infringement of any of the claims of four of the defendants' patents: viz., Birdseye No. 1,773,079, Birdseye No. 1,773,081, Barry No. 1,822,121, and Birdseye and Hall No. 1,822,123.[2] The defendants have filed a counterclaim alleging the infringement by the plaintiff of certain claims of Birdseye No. 1,773,079, Birdseye No. 1,773,080, Birdseye No. 1,773,081, Barry No. 1,822,121 and Birdseye and Hall No. 1,905,131.

The questions before the court are the validity of the patents in issue and the infringement of specified claims by the respective parties. The questions to be decided are defined by a stipulation entered into in this proceeding October 24, 1942.[3]

---

[1] Since the filing of the complaint Frosted Foods Company, Inc., has merged with General Foods Corporation, the latter having assumed all of the liabilities of the former company.

[2] No proof was offered by any party in respect to Birdseye and Hall No. 1,822,-123.

[3] The counterclaim originally included two additional patents, viz., Birdseye No. 1,511,824 and Birdseye No. 1,955,484. The first of these patents was withdrawn by a stipulation dated February 18, 1941. The second was withdrawn by a stipulation dated "October , 1940."

The stipulation of October 24, 1942 provides, " * * * that the only patents and the only claims of said patents or any thereof in issue and in controversy in this cause, either under the bill of complaint or under the counterclaim are:

| PATENTS | CLAIMS |
|---|---|
| Cooke No. 1,614,455 | 1, 3, 4, 7, 8, 14, 16, 17, 19, 20, 24 and 26 to 30, inclusive. |
| Birdseye No. 1,773,079 | 1, 4, 5, 6, 10, 13, 14, 16, 17, 18 and 26. |
| Birdseye No. 1,773,080 | 1 and 2. |
| Birdseye No. 1,773,081 | 9, 11, 19, 20, 24 and 26. |
| Barry No. 1,822,121 | 6 to 12 inclusive. |
| Birdseye et al. No. 1,905,131 | 5, 6, 7, 10, 11, 13, 16 and 17. |

"AND FURTHER, that of the patents owned or controlled by defendant at the time of filing its counterclaim herein, the only patents and claims (except patents and claims withdrawn) which defendant has charged to be infringed by the Booth apparatus, process or product involved in the above-entitled cause are those patents and those claims hereinabove set forth."

■ The defendants' pleadings raised the question of the validity of the Cooke patent and evidence was introduced on this issue. The parties subsequently have taken the position that the question of the validity of the patent is not to be decided, but that issue is before the court. A patent is a monopoly licensed by the United States and the public interest is involved. The court will determine the validity of the Cooke patent as well as the question of its infringement. See Densmore v. Scofield, 102 U.S. 375, 378, 26 L.Ed. 214, and the decision of the Circuit Court of Appeals of this Circuit in Cridlebaugh v. Rudolph, 131 F.2d 795.

### The Plaintiff's Patent.

### Cooke No. 1,614,455.

This patent was issued January 18, 1927, upon an application filed August 20, 1925. It is for a refrigerating apparatus and its specification states as one of its principal objects to provide a means for freezing comestibles, particularly fish, so as to preserve them as nearly as possible in their original condition and to prevent injury to them during the freezing period.

The specification and drawings disclose Cooke's apparatus clearly. It consists of a series of containers with hollow double side-walls through which the brine refrigerant flows. The side-walls also prevent the mass of fish (if fish are to be frozen) from spreading laterally. The bottom of each container is provided with two flat surfaces so formed that they (with the exception of the last) will nest into and form the top of the next lowest container. The first container at the top has a flat top surface. Pipe connections run from a central vat to each container and brine or some other freezing solution is run into the flat surfaces and hollow side-walls of the containers when freezing is to be accomplished. Each container has a counterweight which runs through a pulley connection at the top of a stand above the vat. When the freezing is completed a warm solution may be run through the connecting pipes to the containers to break the adhesion of the frozen mass to the side-walls. The individual containers can then be swiveled over so that the frozen fish will drop into the hands of an operator.

The specification also states, "It is obvious that when the containers are nested one into the other in position for freezing there will be no more weight on the fish in the lower container than on the fish in the upper container, since the entire weight of the container and fish is counter-balanced by the weights. * * * When the containers are nested into position for freezing, a weight, not shown [in the three figures of the patent], is placed on the topmost container. This weight will be of sufficient size to resist to some extent the expansion of the fish which takes place in each container as the freezing process is in operation. From this description it is apparent that this weight will be evenly distributed throughout the entire stack of containers * * *".

Claims 1, 3, 4, 7, 8, 14, 16, 17, 19, 20, 24 and 26 to 30, inclusive, are in issue. Claims 1, 8, 17, 24 and 30 are typical.

Claim 1 is as follows: "A refrigerating device having a series of double-walled containers, said containers arranged so that the bottom of one container forms the cover for the next lower container, and means for circulating a refrigerating medium between the walls of each container."

None of the claims makes any reference to pressure.

The Cooke apparatus is designed for quick freezing;[4] that is to say, freezing which takes from one to three hours as contrasted with slow or sharp freezing which requires a day or more. Cooke states that his apparatus is designed to freeze fish "in the shortest possible time." Quick freezing has distinct advantages over slow freezing. The reasons why will be stated briefly at a later point in this opinion.

■ The defendants contend that this patent discloses mere mechanical variations of the prior art. This statement is not entirely accurate. There is some novelty in pivotally supporting the containers at the ends of the pipes which carry the brine, but at best this is mechanical ingenuity. There is substantial novelty in the counterweight system designed to allow due expansion to the freezing fish, with the weight to be placed on the uppermost container to supply adjustable downward pressure. Although this system is described in the specification, it is not claimed. When the patentee does not claim his entire in-

---

[4] The specification states, "Another object of my invention is to produce a device which will freeze the fish in the shortest possible time."

vention, he must be held to have abandoned it. Permutit Co. v. Graver Corp., 284 U.S. 52, 57, 52 S.Ct. 53, 76 L.Ed. 163; McClain v. Ortmayer, 141 U.S. 419, 424, 12 S.Ct. 76, 35 L.Ed. 800; Keystone Bridge Co. v. Phoenix Iron Co., 95 U.S. 274, 278, 24 L.Ed. 344. If this system had been claimed in the patent, it would be necessary to determine whether Cooke's combination constituted invention. Since it is not, I must conclude that the claims of the patent are for nothing more than mere mechanical improvement over the disclosures of the prior art. The use of hollow walled molds or containers with brine flowing through them for freezing comestibles was disclosed in the Hesketh and Marcet British Patent No. 6,117, of 1889. The use of flat containers in stacks for freezing fish with pressure from overfilling the containers and the weight of the stack was shown in Kolbe No. 1,527,562. See also Jas No. 168,560. I hold the claims in issue to be invalid.

### The Defendants' Patents.

### Birdseye No. 1,773,079.

This patent was issued on August 12, 1930 upon an application filed June 18, 1927. Claims 1, 4, 5, 6, 10, 13, 14, 16, 17, 18, and 26 are in issue. Claims 6 and 17 are typical.

This patent is for a "Method of Preparing Food Products" by quick freezing such comestibles as fish and meat. The specification seems to suggest that Birdseye was the discoverer of the advantages of quick freezing.[5] The fact is that quick freezing as contrasted with slow freezing was well known to the art prior to this patent. Slow freezing produces large ice crystals in the flesh; quick freezing produces small crystals. Some authorities believe, or at least believed, that large crystals rupture the flesh with resulting loss of protein, See Bureau of Fisheries Document No. 1016 by Harden F. Taylor, and his discussion of

the phenomenon of "drip" or protein wastage.[6] The gist of the combination disclosed and claimed by Birdseye in this patent is a method of freezing or quick freezing fish or other comestibles in the containers in which they are to be marketed; viz., in the consumer packages, by using controlled pressure applied through the freezing belts or plates, which serves to fill out the packages evenly, reducing the air spaces which permit of oxidation, dessication or decay in the frozen blocks of food.

Birdseye states in his specification, "As a preferred way of preparing a block of frozen dressed fish. * * * I first form the fish into a compact block or slab, thereby consolidating it and freeing the mass of air as much as possible. * * * Preferably, the block is encased in the wrapper or carton in which it is later marketed. * * *

"I next freeze the block of fish so rapidly and at such a low temperature that the cells of the fish tissue are substantially unbroken. * * *

"As an example of quick freezing by the application of my new method I have attained excellent results in the treating of raw fish and meat, by packing the food in a rectangular carton, the mass being about two inches thick, thus producing a block comparatively free of air, and squeezing the block between metal plates, which * * * are * * * [maintained] at a temperature of 20° to 50° below 0° * * *. By squeezing the block between the metal plates, the block is compacted, any unevennesses are flattened out so that the product presents flat surfaces of substantial area immediately juxtaposed against the sides of the carton with which the metal plates are in contact. This insures a minimum of insulating air layers or spaces and a heat conductive contact over a substantial portion of the surface area of the block with conduction of heat from at least two sides of the compressed

---

[5] The specification states, "In the case of fish or meat * * * slow freezing disrupts the cells of the animal tissue, with loss of the pristine qualities and flavors and rapid deterioration after thawing. By my new method I am able * * * not only to effect any desired degree of refrigeration but to quick freeze a comestible into a compacted frozen block, having comparatively few air spaces, in which the pristine qualities and flavors of the comestible are retained * * * ".

[6] Whether the cellular destruction caused by slow freezing increases "drip" or not still remains an open question. It is not necessary to attempt to decide it here. Quick freezing has obvious advantages. These include speed and ease in the handling of the comestibles and the avoidance of much oxidation and dessication, the forming of molds and the spread of destructive bacteria which take place during slow or "sharp" freezing which requires a period generally in excess of twenty-four hours.

block, which insures uniform and complete freezing in the minimum of time. Preferably I maintain the plates at the desired temperature by applying a cooling fluid thereto, and at the same time provide means whereby the fluid cannot itself come in contact with the package. When the package has remained in freezing contact with the plates a sufficient period of time, it is withdrawn and is ready for marketing."

Claim 6 of the patent is as follows, "A method of packing and preserving food which consists in first packing said food in a container for delivery, applying pressure to said container to press upon opposed surfaces of said packed food and freezing said food in said container by conduction uniformly applied over substantially the entire area of said compressed surfaces."

Claim 17 is as follows, "A process of preparing a food product which consists in packaging the product in a package for delivery, applying pressure to said package to flatten the opposite surfaces of said product, and quick freezing said packaged product by conduction uniformly applied over substantially the entire area of said flattened surfaces while said pressure is maintained."

Does the prior art anticipate the disclosures of this patent?

In McDougall No. 1,140,178 for a "Method of Preserving and Marketing Fresh Fish", the specification discloses the idea of freezing fish in a package to be delivered to the consumer. The fish were to be placed in cartons in rows and have their tails overlapped to make as compact a mass as possible. The specification states, "The box thus filled, is subjected to a temperature below freezing until the contents of the cartons are frozen solid and are retained in such a condition until delivered to the consumer." McDougall states that the space between the fish is not filled with liquid but since there is more or less moisture on and within the fish the contents of each carton is frozen into "practically a solid mass." There is no reference to the use of pressure in the patent. The record shows that the McDougall patent is a paper patent. Attempts were made to freeze Lake Superior herring according to its process. These attempts were little more than experiments. The packages bulged and broke. The freezing was very slow. It took at least two days, and the fish, upon thawing, were soft and sloppy. The Northern Fish Company and Mc-

Dougall abandoned the process. It was in fact inoperable.

The Petersen Reissue Patent No. 15,-683 discloses a method of quick freezing by tightly packing fish within metal cans which are then immersed in a bath of cold brine. The fish come in contact with the flat sides of the can. There would be some hydrostatic pressure because of the brine pressing against the sides of the cans. This pressure would not be subject to control and Petersen did not contemplate freezing fish or other comestibles in the consumer package.

Thompson and Petersen No. 1,509,850, issued on September 30, 1924, upon an application filed June 8, 1922, discloses a method of freezing comestibles "tightly packed in suitable containers for freezing the comestibles en masse into molds of sufficient size to render the storage and handling of them economical. * * *" The plaintiff asserts that this patent " * * * contains a specific disclosure of putting the comestibles in packages, such as baskets, fully adapted for delivery to the ultimate consumer and then freezing in such packages." The plaintiff cites three portions of the patent in support of this view.

Thompson and Petersen refer to "Fig. 9" of their patent which shows a bottom section of a partitioning structure first displayed in "Fig. 2" and state that the arrangement shown permits, " * * * the ready insertion and withdrawal of baskets and the like in which comestibles may be received and packed before inserting them into the refrigerating holders or containers; * * *." If this be a reference to freezing in a consumer package it is a very cloudy one. It will be noted immediately, however, that a basket is not a package or container in the sense that Birdseye uses those words in his specification or claims, viz., a closed package or container. See also "Fig. 7" of the drawings. Thompson and Petersen make no reference to pressure. They contemplated the placing of the basket in a partition which in turn is inserted in a metal container. This apparently was to be immersed in a freezing solution. The resulting hydrostatic pressure could not be controlled, nor, as a matter of fact, could it be applied to opposed surfaces of the baskets containing the comestibles. The other references to baskets or berry baskets in the Thompson and Petersen

specification are no more apt to the Birdseye method.

The plaintiff asserts prior public use by freezing in a consumer package by Petersen at the Booth plant in Chicago and at Bay City, Michigan, at a plant he or his company erected there. He testified that he froze strawberries and raspberries in "the average strawberry basket and the average raspberry basket". He stated, "* * * my idea was to take them just as they come and freeze them just as they come, but I found that did not work * * *". "I took these baskets as they existed in those days, * * *". As to his work as Chicago, Petersen stated that he had only experimental cans, "not to exceed twenty cans all told * * * and there was one of them that happened to fit strawberry boxes as they were in that day, fairly well, provided I got away from this top." The word "top" was used to refer to the curved top of the ordinary berry basket. Petersen also testified that he took off the wooden cover from the baskets and started experimenting with a paper cover, but the paper was not what he wanted; that he then tried "so-called glassine paper", and that he did not know about cellophane at that time. I think it is obvious from a reading of the record that Petersen's work with consumer baskets was experimental and that he abandoned these experiments in 1926.[6] There is no evidence that he attempted to apply pressures by the method disclosed by Birdseye.

Kolbe Patent No. 1,527,562 discloses a method for freezing comestibles by tightly filling a receptacle with them and submerging the receptacle in a liquid freezing medium. Kolbe does not disclose freezing in a package for consumer delivery or the use of other than hydrostatic pressures.

The Thew British Patent No. 5,269, of 1882, referred to by the plaintiff, provides a method for freezing food in sealed cans which, says the plaintiff, "* * * were obviously delivered to the ultimate consumer." Thew did contemplate freezing foods "sealed up in cans or other air tight receptacles". There is little in the patent to indicate that these cans were conceived of by Thew as serving as consumer packages. Thew states that in some cases he prefers to "exhaust the air [from the receptacle] or fill [it] up with carbonic acid nitrogen calcined air or other neutral gas." No system of pressure is disclosed. It is a far cry from Thew to the Birdseye method under discussion.

Dahl No. 1,235,661 for a method of "Freezing Fish And Other Goods In Cases * * *", shows nothing more than a process of passing brine through a box or package. Petersen makes some interesting comments on the Dahl method in his article, "Methods of Freezing Fish" in "Refrigerating Engineering", Vol. 9, No. 1, p. 8.

Cooke No. 1,614,455 does not disclose freezing in a package or container for delivery to the consumer, though the specification of this patent, as I have already indicated, does show a system of controlled pressure which was not claimed.

I find nothing in the prior art which can be deemed fairly to anticipate the method disclosed in Birdseye No. 1,773,079. Birdseye grasped the importance of freezing in a carton, in a package or in a container to be delivered to the consumer. He devised an effective method of doing this. Freezing, consummated by his method, developed substantial commercial success for by controlled pressure it reduced the air in the carton to a minimum. Birdseye's method avoids the necessity of repackaging the comestible and of rehandling it with necessarily increased attendant chances of oxidation and dessication. The Birdseye method reduces the chances of pollution of the food by dirt or bacteria. While some portion of Birdseye's commercial success must be ascribed to improved retail refrigeration and to improved wrappings put around the cartons after

---

[6] It should be observed that in the suit brought by Petersen against General Seafoods Corporation in the District Court for the District of Massachusetts, Petersen testifying in 1932 stated that he did not freeze berries and butter in cans for sale. See p. 110 of the record in Petersen v. General Seafoods Corporation, 1 Cir., 66 F.2d 459. I think that Petersen's testimony in the case at bar in respect to freezing berries in consumer baskets or boxes for commercial deliveries (which he admits were very small in amount) is entitled to little weight. Psychological suggestion is subtle and there is a temptation to remember what is desired. Eibel Process Co. v. Minnesota & Ontario Paper Co., 261 U.S. 45, 60, 43 S.Ct. 322, 67 L.Ed. 523. Petersen's testimony in the case at bar upon this issue was confused and unsupported by any concrete contemporaneous proof.

freezing, none the less I conclude that the method disclosed by this patent constitutes patentable invention. I shall hold only those claims which relate to quick freezing to be valid. I think that it is clear that the Birdseye method as disclosed in No. 1,773,079 was intended to apply only to quick freezing. The specification states, "I * * * freeze the * * * fish so rapidly and at such a low temperature that the cells of the fish tissue are substantially unbroken. * * *" Clearly sharp freezing was not contemplated. Moreover, the product if sharp frozen by the Birdseye method would be subject to all the ills of slow freezing. The very apparatus which Birdseye discloses in the patent is a quick freezing device.[7]

Claims 14 and 16 mention only a container, omitting the words, "for delivery" or "in which it is to be marketed". These claims would allow Birdseye a monopoly on all comestibles quick frozen in a container by the process described in the specification. The file wrapper history of the patent shows that Birdseye distinguished his disclosures over those of Kolbe No. 1,-527,562 by inserting in claim 76 (claim 6 of the patent as issued) after the word "container" the phrase "for delivery". The first step of that claim then consisted of "first packing said food in a container for delivery". Claim 87 of the application (claim 17 of the patent as issued) likewise was amended, to distinguish it from Kolbe, by adding after the word "product" the phrase "in a package for delivery". The claims were allowed with these amendments. Kolbe froze fish in a covered pan which certainly was not delivered to the consumer. I must give effect to this rejection and the state of the prior art.

■■ I hold claims Nos. 10, 13 and 17 to be valid. I hold all other claims in issue to be invalid. Computing Scale Co. v. Automatic Scale Co., 204 U.S. 609, 27 S. Ct. 307, 51 L.Ed. 645; Hubbell v. United States, 179 U.S. 77, 80, 21 S.Ct. 24, 45 L. Ed. 95.

Birdseye made a valuable contribution to the art of freezing comestibles when he devised a successful method of freezing in the consumer package. His patent, however, cannot be accorded the standing of a great pioneer patent as the defendants contend. The plaintiff, however, seeks to narrow unduly the field covered by the patent's disclosures and claims. The patent's actual scope lies between the views expressed by the plaintiff and the defendants. Its claims cover a method of freezing food in the package, container or carton in which it is to be delivered to the consumer. The fact that additional wrappings are added after freezing will not avoid infringement of Birdseye. But the package, container or carton must be such as to enclose the product during freezing. This is implicit in the amendments under which claims 6 and 17 were allowed as it is also in claims 10 and 13. One does not ship food to a consumer in an open box or an open carton. While outer wrappings of cellophane or similar coverings aid in preserving the food and add a salable quality to the packages these things are not essential to the method disclosed in the patent. A tight bond is formed between the six walls of Birdseye's closed consumer cartons by the freezing of the comestibles under uniform pressure. This bond, as the record discloses, aids greatly in the preservation of the products. Without the bond thus formed between the six walls of the package, container, or carton, Birdseye's method would be no more efficacious than any other quick freezing method in which the comestibles were frozen and thereafter wrapped up or put in cartons for consumer delivery.

■ The plaintiff points out that in respect to both its one pound container and its five pound container the container is wrapped and heatsealed in moisture-proof cellophane after freezing. This is nothing more than an additional wrapping. It is clear that in respect to the five pound cartons the plaintiff actually freezes the fish in the packages in which it is delivered to the consumer by the Birdseye method though the packages receive additional wrapping. Its method of freezing in the carton is substantially the same as the Birdseye method. I conclude therefore

---

[7] The emphasis of the specification is upon quick freezing. Birdseye even defines it in the patent. It is interesting to note also a portion of the opening statement of one of the defendants' counsel. Mr. Kerkam made plain that the essence of the Birdseye method consists in placing the food in the cartons and then "quick freezing" in the cartons under uniform pressure. It should be noted that claim 6 of the two typical claims, 6 and 17, does not claim quick freezing, while claim 17 does claim quick freezing.

that as to its five pound cartons the plaintiff infringes the claims in issue. In respect to the one pound cartons the plaintiff freezes in an open top carton and the upper surfaces of the fish are covered with a temporary paper which is later removed after freezing. A wrapper is then put upon the top of the carton. I do not consider that the Birdseye claims are entitled to the broad interpretation which would include the plaintiff's method of freezing the one pound cartons. I conclude, therefore, that as to that method there is no infringement.

### Birdseye No. 1,773,080.

This patent was issued August 12, 1930, upon an application filed June 20, 1927. Claims 1 and 2 are in issue.

Claim 1 is as follows, "An article of manufacture, comprising a marketable package containing frozen animal tissue which has been frozen in the package and which fills said package with a minimum of air voids, said package being substantially no greater in thickness than the same package before having been frozen, the contained animal tissue having in its frozen condition substantially the same cellular structure as it had before it was frozen and retaining its pristine qualities and flavors."

The second claim is substantially the same, except that it provides that the carton shall be "substantially hermetically sealed" and that the carton shall have "throughout the same undistorted cross-sectional outline as before freezing * * *"; the phrases relating to "a minimum of air voids" and the package "being substantially no greater in thickness" after freezing, contained in the first claim are omitted from the second.

This patent is clearly invalid. Its claims are so vague that it is impossible to determine just what they mean and they do not comply with the requirements of Section 4888 of the Revised Statutes, 35 U.S.C.A. § 33, which provide that a patentee, " * * * shall particularly point out and distinctly claim the part, improvement, or combination which he claims as his invention or discovery." See Westinghouse Electric & Mfg. Co. v. Quackenbush, 6 Cir., 53 F.2d 632. The claims are so vague and general that it would be a practical impossibility to determine whether or not they had been infringed. The specification and the claims describe a product in terms of the process steps which create it and are really functional. See General Electric Co. v. Wabash Co., 304 U.S. 364, 373, 58 S.Ct. 899, 82 L.Ed. 1402. The patent is in fact a process patent masquerading as a product patent. I hold the claims to be invalid.

### Birdseye No. 1,773,081.

This patent was issued August 12, 1930, upon an application filed July 7, 1928, as a division of the application for the Birdseye Patent No. 1,773,079. It is for a refrigerating apparatus and is for the machine disclosed but not claimed in Birdseye No. 1,773,079 (see lines 42 to 44 of page 7 of that patent). Claims 9, 11, 19, 20, 24 and 26 are in issue. Claims 19 and 20 are chosen as typical. Claim 19 is as follows, "An apparatus for freezing foods comprising a metal plate adapted to engage a food product, a second metal plate, means to engage with said second plate with any desired degree of pressure a food product engaged by said first plate, whereby said product will be compressed between said plates, and means to freeze said product while compressed between said plates."

Claim 20 is as follows, "An apparatus for freezing foods comprising a metal plate adapted to support an article to be frozen, a second metal plate, means to engage with said second plate the upper surface of a food product supported by said first plate with any desired degree of pressure, and means to freeze an article while engaged between said plates."

In his specification Birdseye describes an apparatus for freezing which consists of two endless imperforate metal belts, one framed above the other. The products to be refrigerated, packed in cartons which are to be of a uniform height or depth are carried through a refrigerating chamber between the upper reach of the lower belt and the lower reach of the upper belt, the belts passing around respective drums at the same speed. A cooling medium which consists of brine or some similar liquid is sprayed from jets on the upper surface of the upper belt and the lower surface of the lower belt as they pass through the freezing chamber.

Birdseye states in his specification, "1 * * * preferably provide means herein for obtaining any desired pressure on the upper conveyor and therefore upon the article passing between the conveyors. While the weight of the upper conveyor belt itself may suffice in some instances, I prefer to supplement that weight, which I

do * * * by use of a plurality of spaced rollers * * * resting upon and supported by the upper surface of the lower reach of the upper belt transversely thereof." He goes on to say that where occasion requires, additional weights may be added to the angle irons supporting the rollers. The speed of the belts may be regulated so that freezing is completed by the time the carton reaches the end of the machine. The upper belt presses down against the carton.

 This machine, so elaborately described in the specification, is scarcely hinted at in any of the claims in issue. While the claims of a patent are to be read upon the specification and there are claims in this patent which do claim the machine Birdseye describes, claims cannot be so broad as to disregard the specification of the patent of which they are a part and so engross the prior art. The claims in issue can be read upon a number of prior patents. Cooke No. 1,614,455 reads upon the claims in issue, the only difference being that Cooke shows hollow plates and sidewalls superimposed upon them for freezing. This difference is functionally unimportant. Cooke, as I have indicated, also disclosed a method of controlling pressure. The essential elements of Cooke, viz., pressure and flat heat conductive surfaces, are really duplicated in the claims in issue.[8]

 Accordingly, I hold them to be invalid.

## Barry No. 1,822,121.

This patent was issued September 8, 1931 upon an application filed August 12, 1929. Claims 6 to 12, inclusive, are in issue. Claim 12 is typical. It provides as follows, "Apparatus for refrigerating food products, comprising chambered heat-conductive plates having plane oppositely-disposed product-engaging faces, connections for circulating a cooling medium through said plates to refrigerate the product engaged between them, and means for separating the plates, said means and said connections being so disposed as to leave two sides of the plates free and unobstructed for the presentation and removal of the product."

[8] In making this statement I am not unmindful of the conclusions expressed by the Court of Appeals for the District of Columbia in Booth Fisheries Corp. v. Coe, 72 App.D.C. 195, 114 F.2d 462, certiorari denied 311 U.S. 691, 61 S.Ct. 72, 85 L.Ed. 447. In that case the plaintiff in the case at bar had petitioned the Patent Office for the reissue of Cooke No. 1,614,455 with claims copied from Birdseye Nos. 1,773,081 and 1,773,079, from Barry No. 1,822,121 and from Birdseye and Hall patent No. 1,822,123. The plaintiff attempted to copy into No. 1,614,455 certain "plate" claims of the patents referred to, relying on R.S. § 4916, 35 U.S.C.A. § 64, and asserting that Cooke had failed to claim plates for freezing by reason of the inadvertence of his patent attorney. The Court of Appeals for the District of Columbia held that Cooke's specification and claims described and claimed a series of stacked containers with hollow side walls through which brine was to be circulated and that "plates" are not "containers". Reissue was therefore denied.

R.S. § 4916 provides that reissue shall be granted "Whenever any patent is wholly or partly inoperative or invalid, by reason of a defective or insufficient specification, or by reason of the patentee claiming as his own invention or discovery more than he had a right to claim as new, * * *." I cannot see how the Cooke patent as issued was wholly or partly inoperative by reason of a defective or insufficient specification or by reason of the patentee claiming as his own invention or discovery more than he had a right to claim as new. I think that the Court of Appeals of the District of Columbia was correct in its decision in denying the reissue of the Cooke patent. But the issue presented by the appeal to that court was narrower than that which is before me. In denying the reissue the court merely held that the statutory requirements had not been met. I must determine whether Cooke anticipated the Birdseye patent under discussion. The figures accompanying the Cooke patent and its specification show that the flat bottom surfaces of the containers are hollow as are the container walls. I am unable to see any substantial functional difference between Cooke's containers and Birdseye's plates. The defendants insist that the decision of the Court of Appeals for the District of Columbia must be construed as an adjudication that the "plate" claims or disclosures of Birdseye or Barry are not the equivalent of Cooke's "container" claims or disclosures. I must disagree with that assertion.

What has been said in this note in respect to Birdseye No. 1,773,081 is also applicable to the patents and claims which are to be discussed hereafter in this opinion.

 In my opinion this patent clearly is anticipated by the prior art and in particular by the Cooke patent. I have already stated that I can see no substantial difference between hollow plates used for freezing without side walls and hollow plates and sidewalls similarly employed. Assuming that Barry's plates are functionally different from Cooke's containers, these differences can consist only of the facts that the containers prevent lateral expansion of the freezing products and also aid in freezing them. These are minor distinctions. The fact that the plates in the Barry apparatus are so arranged that comestibles can be easily put on them before freezing and easily taken off them after freezing, cannot be held to amount to invention. The essentials of Barry are discoverable in Cooke, including a counterweight system and the circulation of the cooling solution within the hollow heat conductive members of the apparatus.

I hold the claims in issue to be invalid.

### Birdseye and Hall No. 1,905,131.

This patent was issued April 25, 1933, upon an application filed February 25, 1931. Claims 5, 6, 7, 10, 11, 13, 16 and 17 are in issue. Claims 10 and 17 are typical.

Claim 10 is as follows, "Refrigeration apparatus for food products, comprising a stack of substantially horizontal coöperating heat-conductive plates mounted and maintained in substantially vertical aline-ment with each other and having passages therein, means for initially supporting the plates in spaced relation to receive products therebetween at different levels and independent refrigerating connections communicating with the passages of the respective plates and arranged to permit the relative movement thereof."

Claim 17 is as follows, "A refrigerating apparatus comprising a series of chambered heat-conductive plates arranged in horizontal position one above another, the uppermost plate being stationary and those below it being arranged to receive food products to be frozen, mechanically-operated means for moving all of the product-receiving plates upwardly to engage the products with a predetermined pressure against the under face of the next adjacent plate, and means for delivering a refrigerating medium to the plates to freeze the products while so engaged."

The specification discloses the plates are to be moved to closed positions by the upward movement of an hydraulic ram from the bottom of the press.

 This patent also is anticipated by Cooke No. 1,614,455 and the various elements thereof by Hesketh and Marcet and Kolbe. While the apparatus disclosed by Birdseye and Hall is somewhat different from the apparatus of the Cooke patent the differences are superficial. Birdseye and Hall's apparatus is a plate machine, while Cooke, as has been said before, uses containers with flat surfaces which had the same function as the Birdseye plates with the addition of side-walls. I shall not state again the reasons why I consider no element of invention to reside in the use of hollow heat conductive plates without hollow side-walls. The use of an hydraulic ram to apply pressure upward through the series of plates doubtless is an improvement and a refinement of the downward pressure exerted by Cooke by a weight upon the top of the uppermost container, but this is only a mechanical improvement.

I hold the claims in issue to be invalid.

### Conclusion.

The bill of complaint will be dismissed as to Cooke No. 1,614,455. A declaratory judgment will be entered to the effect that the plaintiff is free to proceed without liability for the infringement of the claims in issue of the defendants' patents No. 1,773,080, No. 1,773,081, No. 1,822,121, and No. 1,905,131. The counterclaim will be dismissed as to all of the Birdseye patents except No. 1,773,079. The claims in issue of the defendants' patent No. 1,773,079 are held to be valid and infringed as indicated in this opinion. An injunction will issue and an accounting will be ordered.

A decree may be submitted.

Findings of fact and conclusions of law are filed with this opinion in accordance with the provisions of Rule 52(a), Rules of Civil Procedure, 28 U.S.C.A. following section 723c.