**INNIS, SPEIDEN & CO. et al. v. FOOD MACHINERY CORPORATION (BROGDEX CO. OF CALIFORNIA, Ltd., Intervener).**

No. 1268.

District Court, D. Delaware.

April 1, 1943.

Herbert L. Cohen and William H. Foulk, both of Wilmington, Del., and Wallace D. Newcomb and Henry N. Paul (of Paul & Paul), both of Philadelphia, Pa., for plaintiffs.

James R. Morford (of Marvel & Morford), of Wilmington, Del., and Roy F. Steward, of New York City, for Brogdex Co. of California, intervener.

E. Ennalls Berl, of Wilmington, Del., Charles M. Thomas, of Washington, D. C., Leonard S. Lyon and Richard F. Lyon, both of Los Angeles, Cal., and Philip A. Minnis, of San Jose, Cal., for defendant.

BIGGS, Circuit Judge.

This is a suit for the infringement of United States Patent No. 1,943,468, granted to Walter A. Bridgeman and John Alan Schade on January 16, 1934, for a "Wax Emulsion Coating, and Coating Process". Innis, Speiden & Company is the owner of the patent and Franklin Research Company is an exclusive licensee under an agreement dated April 2, 1937. The intervener, Brogdex Company of California, Ltd., was permitted to come into the suit by reason of certain rights growing out of an agreement dated January 3, 1938. The reasons for the allowance of this intervention are stated in a prior opinion of this court. See 2 F.R.D. 261.

The specification of the patent · states that Bridgeman and Schade's disclosures relate to the art of preparing fresh fruits and vegetables for market and are concerned "\* \* \* more particularly with a process for the treatment of fresh fruits and vegetables and with wax emulsion coating compositions adapted therefor." The patent points out that it is old in the art to use waxy coatings for fruit to prevent the spread of destructive fungi, to preserve natural juices, to give the fruit a more attractive appearance. The prior art demonstrates that such coatings were used to prevent evaporation and shrinkage.

The specification states: "The invention \* \* \* in essence, resides in the provision of a simplified, economical, one-operation, cold coating process yielding a product coated with a lustrous waxy composition which preserves and enhances the value of the treated object, and in the provision of a coating bath of an aqueous waxy emulsion having the necessary surface tension to spread completely yet in a very thin film and to dry quickly, which film of waxy coating requires no buffing or polishing at any time—either during the formation of the film or thereafter—in order to bring up or maintain a desirable lustrousness."

The specification states also: "Our researches in this connection have established that our emulsion in order to be suitable for the purposes of the present invention should have a surface tension of below 70 dynes per centimeter, and that the most satisfactory emulsions have a surface tension value of from about 45 to about 33 dynes per centimeter, as determined at 20°C. on a du Nouy surface tension apparatus such as was described by P. Lecomte du Nouy in 'The Journal of General Physiology', May 29, 1919, vol. 1, No. 5, pages 521 to 524, inclusive, which apparatus shows a surface tension value, at 20°C., for water distilled in glass of 69.3 dynes per centimeter. Thus we have found that for citrus fruits (oranges and grapefruit), tomatoes, and certain other fruits, it is preferable to use an emulsion having a surface tension of 34–36 dynes per centimeter, while an emulsion having a surface tension of 45 dynes per centimeter shows a tendency to draw away from the fruit leaving uncoated areas. Bananas and pineapples, on the other hand, advantageously may be coated with an emulsion having a surface tension of about 44–45 dynes, although emulsions having

surface tensions above 45 dynes (e.g., 49 dynes or 51.2 dynes) have a tendency to draw away from the surface of a banana into drops on drying."

The specification contains two examples of methods for mixing the emulsion. The first example in the specification gives a method of mixing the emulsion by weight. The second sets out a method of mixing the emulsion by percentages of its constituents and states the "values in dynes per centimeter" of certain waxes, including carnauba, carnauba with pontianak and carnauba with ammonia-cut shellac. The specification goes on to state, "The * * * emulsion [described in Example II] had a surface tension value, at 20°C., of about 35 dynes per centimeter as determined on a deNuoy [sic] surface tension apparatus whose reading, at 20°C., for water distilled in glass was 69.3 dynes per centimeter. Dilution with an equal weight of water, to form a desirable coating bath, raised the surface tension value of the emulsion less than one dyne per centimeter." The solutions are formed as is indicated in the example by mixing the emulsions with suitable amounts of water.

Claims 5, 6, 7 and 12[1] are in issue. Claims 5, 6 and 7 are product claims and claim an emulsion composed of carnauba wax and water, though other waxes may be included in the emulsion. Claim 12 is a process claim. All of the claims state that the emulsion or coating composition shall have a surface tension at 20°C. of from about 45 dynes to about 33 dynes per centimeter. The coating composition or emulsion referred to in the claims and in the specification refers to a coating composition or an emulsion before it is mixed with the water in the bath into which the fruit is passed. This is demonstrated clearly by the table appearing upon page 3 of the patent (lines 79 to 89, inclusive) where Bridgeman and Schade state that a dilution of their carnauba wax emulsions as high as one part of emulsion with three parts of water serves to raise the surface tension of the bath only from 37.8 dynes to 38.3 dynes.

Surface tension is described in Webster's New International Dictionary as, "That property, due to molecular forces, which exists in the surface film of all liquids and tends to bring the contained volume into a form having the least superficial area." To use an example, if an orange is being coated with a liquid and the surface tension is too great, the liquid will "crawl" on the surface of the fruit and will form globules or drops of liquid. If the surface tension is too low, the liquid will not dry readily. Surface tension may be expressed in terms of dynes per centimeter at a given temperature. A dyne is a measurement of dynamic power, the unit of force employed in the centimeter-gram-second (C.G.S.) system. It is enough for the purposes of this opinion to state, as the plaintiffs do in their brief, that the dyne is a "unit of force * * * customarily used to express surface tension values." Surface tensions in terms of dynes are computed frequently, as was done by Bridgeman and Schade in the patent sub judice, by the use of the du Nouy surface tension apparatus.[2]

The patent states that it is a "continuation-in-part" of an application filed by Bridgeman and Schade on February 18, 1932, Serial No. 593,927. This application is in evidence and the certificate of the Commissioner of Patents describes it as an "Abandoned Application". It was for an "Improvement in Wax Emulsion Coatings and Coating Process". No specific surface tensions were set out in this application. It was rejected by the Patent Office principally upon the ground that the specification called for the use of old materials for obvious pur-

---

[1] Claim 5 is as follows: "A coating composition for providing a lustrous protective coating on a natural food product, comprising a waxy component including carnauba wax, water, and an emulsifying component therefor, said composition having a surface tension at 20°C. of from about 45 dynes to about 33 dynes per centimeter."

Claim 12 is as follows: "Process of providing a natural food product with a lustrous protective waxy coating, which consists in passing the natural food product into and out of a bath of aqueous carnauba wax emulsion which shows, at 20°C., a surface tension of from about 45 dynes to about 33 dynes per centimeter, and thereafter draining and drying the so-treated product."

[2] The du Nouy apparatus and the method of employing it will be discussed briefly at a later point in this opinion. A catalogue gotten out by the "Central Scientific Company" on the subject of Cenco-du Nouy Tensiometers, entitled Bulletin No. 101, explains the method of employing Cenco-du Nouy Tensiometers to measure surface tensions. See Exhibit D-224.

poses. The abandonment by the applicants followed.

The application upon which the patent in suit was issued was filed on November 22, 1932 and has the serial number 643,950. All of the original claims of the application were first rejected, in the words of the Examiner, "* * * as lacking invention over the art cited which shows it to be old to use carnauba wax as a coating material", citing to the particular attention of the applicants the disclosure of what is called in this case, the Carbon and Carbide pamphlet.[3] The Examiner went on to state, "The particular surface tension set forth in Claims 1–10, 14, 15 and 16 is not deemed critical and is not a basis upon which to predicate patentable novelty." The surface tensions referred to are precisely those of the claims in issue, viz., of from about 45 dynes to about 33 dynes per centimeter at 20°C. The original specification contained in the application is the same as the present specification of the patent and refers to calculations of surface tension made by a du Nouy tensiometer showing a surface tension at 20°C. for water distilled in glass of 69.3 dynes per centimeter. Thereafter the applicants, as appears from the file wrapper history "demonstrated" to the assistant and primary examiners by actual dipping tests that the particular surface tension conditions set out in the claims were "in fact critical" and marked "the difference between success and failure in the attempt to provide a natural fresh food product such, for instance, as an orange, with a lustrous relatively thin, protective waxy coating by a cold dipping process." The Patent Office thereupon allowed the claims in the patent, including those in issue, which claimed an emulsion principally composed of carnauba wax having a surface tension at 20°C. of from about 45 dynes to about 33 dynes per centimeter. The claims were allowed therefore on the basis that the surface tensions set up in the specification and the claims were critical.

Bridgeman testified that the surface tensions set out in the patent were not theoretical, but were found by a physicist, employed by him and his co-patentee, who used a du Nouy tensiometer. The proof demonstrates that the du Nouy tensiometer used was not properly adjusted. The evidence shows and the parties agree that a du Nouy tensiometer when properly adjusted gives a reading at 20°C. of water distilled in glass of 72.75 dynes per centimeter. As the specification states the du Nouy tensiometer used to arrive at the surface tensions of the patent, gave a reading for water distilled in glass of 69.3 dynes per centimeter at 20°C. Dr. A. Lloyd Taylor, an expert witness testifying on behalf of the plaintiffs, stated that a du Nouy tensiometer that recorded "69 for water" was not adjusted to give correct results and that the surface tensions arrived at by using a du Nouy tensiometer so adjusted would have to be multiplied by a factor of correction to bring them in line with "Smithsonian" data. This witness stated that these corrections could be made quite simply by using a ratio of 69 to 72.75; that is to say, by multiplying the surface tensions found by the maladjusted tensiometer by the fraction, 69 over 72.75. That some reduction in dynes would be necessary is obvious since a carnauba wax emulsion would have a lower surface tension than that of distilled water, but the task of making the corrections is not so easy as Dr. Taylor indicates. Dr. James W. McBain, an expert witness testifying on behalf of the defendant, agreed that a du Nouy tensiometer which gave a reading for distilled water of 69.3 was not adjusted correctly but asserted that since the error in the adjustment of the du Nouy tensiometer used by the patentees' physicist could not be traced "to any one particular maladjustment with any certainty" it would be impossible to effect corrections of the surface tensions found by the instrument.

An examination of Bulletin No. 101 convinces me that Dr. McBain's statements are correct. As appears from the Bulletin the du Nouy Tensiometer[4] has a sensitive tortion balance which applies a slowly increasing force to an accurately constructed platinum-iridium ring which has been put in contact with the surface of the liquid to be measured. The amount of force necessary to pull the ring from the liquid is indicated on a calibrated dyne scale on the

[3] See defendant's Exhibit 216-H, an article published by A. L. Wilson, Carbide and Chemical Corporation, contained in "Industrial and Engineering Chemistry", February, 1930.

[4] "Cenco-du Nouy Tensiometers" to which the Bulletin specifically refers are tensiometers made in accordance with the principles disclosed by du Nouy by Central Scientific Company. The word "Cenco" is simply the trademark of that company.

tensiometer. In other words, an arm of the tensiometer, working upon a lever principle, pulls the ring from the surface of the liquid and the force necessary to pull the ring from the surface of the liquid is measured in dynes.

The size, the shape and the cleanliness of the ring which comes into contact with the surface of the liquid to be tested are important factors. The temperature of the liquid is important also, but the adjustment of the du Nouy tensiometer before the test is made so that it will give a reading of 72.75 dynes per centimeter for water distilled in glass at 20°C. is a prime factor. Bulletin No. 101 discusses correction factors for Cenco-du Nouy Tensiometer rings. It is stated that the necessary correction factor for tensiometers, according to Harkins and Jordan, might vary from unity by as much as plus or minus 30 per cent.[5] While this factor of correction according to the Bulletin would not be very large " * * * for the rings of carefully proportioned dimensions supplied with the Cenco-du Nouy Tensiometers * * *", it is a matter of speculation as to the dimensions of the ring which was used on the du Nouy tensiometer by Bridgeman and Schade's physicist. The Bulletin states that the platinum-iridium ring of the Cenco-du Nouy Tensiometer is 4 cm.; that is to say, its periphery is 4 cm. in length. The length of the ring is a very important factor in the accuracy of the measurements supplied by the du Nouy machine. The use of a large ring will result in high readings of surface tensions. A short ring will effect the opposite result. Bridgeman testified that the du Nouy tensiometer which was used for determining the surface tensions set out in the patent was borrowed from Cornell University. He stated also that he did not know the type of ring used, only that it was of platinum wire. The ring was apparently not of platinum-iridium wire as is customary. Schade testified that he had heard that the du Nouy tensiometer, employed to arrive at the surface tensions stated in the patent, was a "students' model".

The background of the patentees' experiments in surface tensions does not aid the patent. As has been stated, it is impossible to attribute the maladjustment of Bridgeman and Schade's tensiometer to any particular cause. The maladjustment may have been due to one or more of several factors, some of which have been mentioned. If the adjustment of Bridgeman and Schade's tensiometer was made with distilled water which had collected foreign matter after distillation, that matter by physical law would tend to rise to the top of the liquid and would reduce the surface tension of the liquid to an unknown degree. Surface tension readings of emulsions made with a du Nouy instrument calibrated by the use of such distilled water could not be corrected unless one knew the extent to which the distilled water was polluted. Since the factor or factors which upset the calibration of Bridgeman and Schade's tensiometer are not demonstrated by the record, it is idle to speculate as to what the surface tensions stated in the claims actually should be.

The claims of a patent must be read upon its specification. In the case at bar, I am of the opinion, as has been indicated, that it is impossible to apply the theory of the inventors' vocabulary in favor of the patent. See the decision of the Circuit Court of Appeals for this circuit in Electric Storage Battery Co. v. Shimadzu, 123 F.2d 890, 896. Even construing the word "about" in the phrase "from about 45 dynes to about 33 dynes per centimeter" used in the specification and in the claims broadly in favor of the plaintiffs,[6] in view of

---

[5] Bridgeman stated in response to a question asked by the court as to why the patent contained the specification of the dynes at 69.3 on water distilled in glass at 20°C., "Well, I will tell you what happened—there was a series of determinations made on distilled water, made in our laboratory, and this series of determinations ran from a low of 69, or whatever the figure is in the patent, to a high of somewheres around 73, and in transmitting that information to our patent attorneys, it was given just that way, as I recall it; unfortunately the low figure was taken as the description in the pat-

ent, and that is the whole story, and the instrument was later—I know that the instrument reads between those figures, or did read between those figures." This is an unconvincing explanation. It would imply that the patentees had not read their own application before swearing to it. There is little in the record to indicate that the patentees regarded the calculations of surface tensions as a matter requiring great precision.

[6] It is extremely difficult to see how the Patent Office could determine that the surface tensions of the emulsion were-

the error in the tensiometer readings and the failure of the plaintiffs to trace that error to any particular factor, the surface tensions of the specification and the claims are too vague and indefinite to comply with R.S. § 4888, 35 U.S.C.A. § 33, which requires that an inventor " * * * shall particularly point out and distinctly claim the part, improvement, or combination which he claims as his invention or discovery." The claims are too uncertain and too ambiguous to designate the invention as completely and precisely as the statute requires. See General Electric Co. v. Wabash Appliance Co., 304 U.S. 364, 372, 58 S.Ct. 899, 82 L.Ed. 1402, and Booth Fisheries v. General Foods Corporation, D.C., 48 F.Supp. 313, 320.

If, on the other hand, I were to adopt the course, unwarranted by patent law, of disregarding the error in calibration of the du Nouy tensiometer as set forth in the specification and treat the surface tensions set out in the claims as standing without reference to the specification, the claims would have to be held invalid for the reason that the surface tensions specified in the claims are not in fact critical. The record demonstrates to my satisfaction that whether or not a carnauba wax emulsion dries bright and lustrous upon fresh fruit or vegetables has nothing to do with surface tension. It was proved also that two carnauba wax emulsions can have the same proportions, the same ingredients and the same surface tensions, and that both can wet the surface of an orange freely and yet one will dry with a high luster and the other will dry with a chalky appearance. James F. Hussey, a witness, originally employed by the defendant, testifying for the plaintiffs, stated that he would set 40 dynes as about the top limit of a carnauba wax emulsion which could be used successfully, that beyond this the emulsion would "crawl" up upon the fruit not really wetting it. This witness also testified that he attributed the high polish which resulted from carnauba wax emulsions to very small crystals which reflected the light and that if the crystals dried lying flat upon the fruit instead of standing on edge there would be no reflection of light and hence no natural luster. He did not attribute the phenomenon of particles of wax standing on edge to surface tension. Indeed it would be absurd to do so. Cyril S. Kimball, a chemist testifying on behalf of the defendant, gave what seems to me to be the best explanation of why some carnauba wax emulsions dry bright while others dry with a chalky appearance. He stated: "The ability of a wax dispersion to dry and give a luster is related to the size of the particles in the dispersion. A dispersion having large or coarse particles does not dry with a luster." He went on to say, and I think correctly, that the size of the particles of wax in the emulsion is dependent, at least to some extent, upon the methods employed in mixing the emulsion and the order in which the various operations are performed. It is to be noted that no particular mode of procedure is claimed in the patent and the specification expressly states that the order of operations may be varied. Schade testified on cross-examination that he did not believe that there would be any limit to how low one might go in surface tension and still have an emulsion that would have utility and effectively coat citrus fruit. The upper range of the surface tension specified in the patent, viz., 45 dynes, is about the range at which such fruit could be effectively coated. Hussey testified that a surface tension of 35 or 36 dynes was near the point where the emulsion would start to crawl upon an orange. The upper range of about 45 dynes specified in the claims seems to have been arbitrarily selected. The maximum figure is above the range at which citrus fruits may be wetted adequately. The lower figure of about 33 dynes seems equally arbitrary. A carnauba wax emulsion with a much lower surface tension would coat an orange effectively and cause it to dry bright.

Accordingly the claims in issue are held to be invalid. In view of this decision it is unnecessary to determine the rights of the intervener, Brogdex Company of California.

The complaint will be dismissed for want of equity.

Findings of fact and conclusions of law are filed with this opinion.

A decree may be submitted.

---

critical as given in the claims and in the specification when they were hedged about with such a word of approximation.